**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

BRENDA DRAKE, on behalf of
herself and all others similarly situated,

          Plaintiff,

            v.

FIRSTKEY HOMES, LLC,

          Defendant.

)
)
)
)
)
)
)
)
)
)

Case No. 1:19-CV-1746-LMM

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT FIRSTKEY
HOMES, LLC'S MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, TO DISMISS PROPOSED CLASS ALLEGATIONS**

# TABLE OF CONTENTS

Introduction ................................................................................................. 1

Relevant Facts ............................................................................................. 4

    A.  Plaintiff was the subscriber to and customary user of cellular telephone number (317) 225-6386, which she obtained in July 2018. ................................... 4

    B.  FirstKey called Plaintiff's cellular telephone number twice and, in both instances, Plaintiff's voicemail greeting identified her phone as belonging to Brenda .............................................................................................................. 5

    C.  FirstKey left a prerecorded solicitation message on Plaintiff's cellular telephone voicemail .................................................................................... 6

    D.  Plaintiff had no relationship with FirstKey, did not provide her cellular telephone number to FirstKey, and did not consent to its calls. ............................ 6

    E.  Plaintiff does not know Brittany Valentine. .................................. 7

Legal Standard ............................................................................................ 7

Argument ..................................................................................................... 8

I.    Binding Eleventh Circuit law forecloses FirstKey's reliance-based defense ..... 8

    A.  The TCPA is a strict liability statute, and that FirstKey claims to have received misinformation from Ms. Valentine is immaterial for standing and liability purposes. .................................................................................... 8

    B.  Even if FirstKey obtained prior express consent from Ms. Valentine, Plaintiff is the called party and consent must come from her. ......................... 10

    C.  The D.C. Circuit did not establish a broad "reasonable reliance" defense, which would be at odds with *Osorio* and the strict liability nature of the TCPA… ................................................................................................ 12

D.   FirstKey's consent defense separately fails because the narrow consent language it relies on does not cover the prerecorded telemarketing message it left for Plaintiff. ....................................................................................16

E.   Even if *Osorio* did not control—it does—FirstKey fails to establish the predicate facts for its reliance-based defense through admissible evidence. .......19

F.   FirstKey was on actual notice that it was calling Brenda's cellular telephone number, not Brittany Valentine's. .........................................................20

II.   Plaintiff adequately states a claim resulting from FirstKey's failure to provide an automated opt-out mechanism. ..........................................................20

III.   This Court should not strike Plaintiff's class allegations. ............................24

IV.   The TCPA is constitutional. ..........................................................28

Conclusion ..........................................................31

# TABLE OF AUTHORITIES

## Cases

*Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303 (S.D. Cal. 2015) ..............26

*ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018) ......... passim

*Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768 (11th Cir. 2011)............9

*Am. Ass'n of Political Consultants, Inc. v. Fed. Commc'ns Comm'n*. 923 F.3d 159 (4th Cir. 2019) ...............................................................29

*Argentine v. Bank of Am. Corp.*, No. 8:15-CV-957-T-26JSS, 2015 WL 12844395 (M.D. Fla. July 29, 2015) ...................................27

*Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 322 F.R.D. 458 (N.D. Ill. 2017) ....................................................26

*Berman v. Freedom Fin. Network, LLC*, --- F. Supp. 3d ----, 2019 WL 4194195 (N.D. Cal. Sept. 4, 2019) ...........................................14, 15

*Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316 (S.D. Fla. 2012)............9

*Chyba v. First Financial Asset Mgmt.*, 2014 WL 1744136 (S.D. Cal. Apr. 30, 2014) ............................................................................15

*Cullars Family Timber Farm, LLLP v. Weyerhaeuser Co.*, No. CV 116-188, 2017 WL 7689146  (S.D. Ga. Apr. 27, 2017) .........................................25

*Danehy v. Time Warner Cable Enters.*, 2015 WL 5534094 (E.D.N.C. Aug. 6, 2015) ............................................................................15

*Duguid v. Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019)............................... 28, 29

*Engle v. Unified Life Ins. Co., Inc.*, No. 14CV1908MMAJLB, 2014 WL 12508347 (S.D. Cal. Oct. 27, 2014) ...................................23

*Etzel v. Hooters of Am., LLC*, 223 F. Supp. 3d 1306 (N.D. Ga. 2016) ...................28

*Gallion v. United States*, No. 18-55667, 2019 WL 2913970 (9th Cir. July 8, 2019) .......................................................................................... 28, 29

*J&J Sports Prods. Inc. v. Midtown Haven, Inc.*, No. 1:18-CV-03581-LMM, 2019 WL 4751865 (N.D. Ga. June 5, 2019) ........................................................8

*Jiminez v. Credit One Bank, N.A.*, No. 17 CV 2844-LTS-JLC, 2019 WL 1409425 (S.D.N.Y. Mar. 28, 2019)........................................................ 13, 14, 15

*Johnson v. Capital One Services, LLC*, No. 18-cv-62058-BLOOM/Valle, 2019 WL 4536998 (S.D. Fla. Sept. 19, 2019)........................................................9

*Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501 (S.D. Ind. 2016)....................26

*Karpilovsky v. All Web Leads, Inc.*, No. 17 C 1307, 2018 WL 3108884 (N.D. Ill. June 25, 2018) ...........................................................................................26

*Knapper v. Cox Communications, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019) ........ 20, 26

*Lavigne v. First Community Bankshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018) ..........................................................26

*Liotta v. Wolford Boutiques, LLC*, No. 1:16-CV-4634-WSD, 2017 WL 1178083 (N.D. Ga. Mar. 30, 2017) .......................................................................23

*Lunsford v. Woodforest Nat. Bank*, 299 F.R.D. 695 (N.D. Ga. 2013)....................25

*Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999) .................................................8

*McCabe v. Daimler AG*, 948 F. Supp. 2d 1347 (N.D. Ga. 2013)...........................27

*Nack v. Walburg*, No. 10–CV–478, 2011 WL 310249 (E.D. Mo. Jan. 28, 2011)...24

*Nelson v. Mead Johnson Nutrition Co.*, No. 09-CV-61625, 2010 WL 11457653 (S.D. Fla. Mar. 18, 2010) ..................................................................25

*Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014) ............. passim

*Palm Beach Golf Center–Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015) ...........................................................................10

v

*Perez v. Rash Curtis & Assocs.*, No. 16-cv-03396-YGR, 2019 WL 1491694 (N.D. Cal. Apr. 4, 2019) ....................................................................14

*Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018 WL 3145807 (S.D. Fla. June 26, 2018) .........................................................26

*Roark v. Credit One Bank, N.A.*, 2018 WL 5921652 (D. Minn. Nov. 13, 2018) ....15

*Romano v. Motorola, Inc.*, No. 07-CIV-60517, 2007 WL 4199781 (S.D. Fla. Nov. 26, 2007) .......................................................................................25

*Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) ..................................................10

*Sliwa v. Bright House Networks, LLC*, No. 216CV235FTM29MRM, 2018 WL 1531913 (M.D. Fla. Mar. 29, 2018) ....................................................30

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) .................11

*Sullivan v. All Web Leads, Inc.*, No. 17 C 1307, 2017 WL 2378079 (N.D. Ill. June 1, 2017) ................................................................................. 17, 18

*Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876 (8th Cir. 2005) ......................................................................................15

*West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017) ........................26

*Wijesinha v. Bluegreen Vacations Unlimited, Inc.*, No. 19-20073-CIV, 2019 WL 3409487 (S.D. Fla. Apr. 3, 2019) ..................................................30

## Statutes

47 C.F.R. § 64.1200 ............................................................................... 21, 22, 24

47 U.S.C. § 227 ........................................................................................ 1, 8, 30

47 U.S.C. § 608 ..............................................................................................29

## Other Authorities

Declaration of Brenda Drake .......................................................................... passim

Declaration of Matthew B. Hansen...........................................................................5

## Introduction

The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, makes it illegal to place autodialed telemarketing calls, and deliver prerecorded voice messages, without the express written consent of the called party. FirstKey Homes, LLC ("FirstKey") admits that it delivered a prerecorded telemarketing message to Brenda Drake's ("Plaintiff") cellular telephone number (and does not dispute that it used an automatic telephone dialing system ("ATDS") to do it). At the same time, FirstKey fails to present any evidence that it obtained written consent from Plaintiff to place such calls. And, in fact, Plaintiff did not provide any such consent.

Notwithstanding, through its Motion for Summary Judgment or, Alternatively, to Dismiss Proposed Class Allegations ("Motion"), Doc. 29-1, FirstKey seeks judgment in its favor because, it claims, it could reasonably rely on representations Brittany Valentine (a non-party to this action) made while perusing the website Zillow (also a non-party to this action). To that end, FirstKey says Ms. Valentine provided a cellular telephone number to Zillow and attested that it was her own. As such, FirstKey suggests, it cannot be liable for autodialing Plaintiff's cellular telephone number and leaving a prerecorded solicitation voicemail.

The problems with FirstKey's positions are multiple. First, the TCPA is a strict liability statute and callers like FirstKey must obtain, in the case of solicitation calls like those at issue here, prior express written consent of the *called party*—the

1

subscriber or customary user of the cellular telephone at issue. Because FirstKey offers no evidence that it obtained express written consent *from Plaintiff* (and the uncontroverted evidence demonstrates that she did not provide such consent), its consent-based defense fails as a matter of law.

Second, even if consent provided by Ms. Valentine could be imputed to Plaintiff (it cannot), the narrow consent language on Zillow's website does not cover the telemarketing message FirstKey left for Plaintiff. Rather, the consent language cited by FirstKey allows it to "call or text you about your inquiry," not to deliver unrelated telemarking messages, weeks later, untethered from specific inquiries. Thus, FirstKey did not obtain effective consent from anyone, let alone Plaintiff.

In any event, FirstKey wholly fails to establish the predicate facts necessary for its "reasonable reliance" defense—even if such a defense was viable (it is not). To start, FirstKey offers no proof that Ms. Valentine was the subscriber or customary user of the telephone number at issue at any point in time or that she had authority from Plaintiff to consent to calls on Plaintiff's behalf.

Third, and more fundamentally, FirstKey relies on inadmissible double hearsay to demonstrate the predicate facts necessary for its theory of consent. That is, FirstKey offers no evidence from Ms. Valentine demonstrating that she (a) submitted Plaintiff's number to Zillow, (b) provided express written consent to be called, (c) had authority to act on Plaintiff's behalf, or (d) was ever the subscriber to

2

Plaintiff's cellular telephone number. Nor does FirstKey offer evidence from anyone who witnessed Ms. Valentine provide such information to Zillow.

To make matters worse, FirstKey offers no evidence from Zillow at all, such as (a) an explanation from Zillow regarding how it came into possession of Ms. Valentine's name and information, (b) an attestation to the accuracy and reliability of Zillow's internal records, and the information it provided to FirstKey, or (c) a description of how, if at all, Zillow verifies the identities of the persons who provide information through its platforms. Instead, FirstKey relies on a printout of a record it says Zillow provided to it. FirstKey then asks this Court to draw all inferences from this record in its favor—*i.e.*, that Zillow's records are accurate, that Ms. Valentine had authority to provide the telephone number at issue, that Ms. Valentine consented to calls from FirstKey by way of her interactions with the Zillow platform, and that Ms. Valentine—as opposed to anyone else—provided the information. But at the summary judgment stage, FirstKey cannot rely on unsubstantiated inferences.

Fourth, FirstKey's reliance defense fails for a separate reason: When it called Plaintiff in January 2019, Plaintiff's voicemail greeting identified her as Brenda. FirstKey therefore had actual notice that it was calling Brenda, and not Ms. Valentine, before it delivered telemarketing messages to her. Therefore, it was no longer reasonable for FirstKey to rely on information provided by Zillow.

Separately, FirstKey argues that while it did not offer an *automated* option for call recipients to opt out of future calls as required by the TCPA's implementing regulations, Plaintiff cannot maintain a cause of action for that violation. Case law, including from this district, suggests otherwise.

FirstKey also argues that the TCPA is unconstitutional. This is not so, as the United States explains in a companion filing. *See* Doc. 39-1. And in any event, even if the some of the TCPA's statutory exemptions are unconstitutional, these exemptions can be severed from the statute and have no bearing on this case.

Finally, FirstKey asks this Court to take the extraordinary step of striking Plaintiff's class allegations prior to the inception of class discovery. Not only is FirstKey's request premature, but many district courts have certified TCPA class actions under similar circumstances. This Court should refuse FirstKey's efforts to strike Plaintiff's class allegations at this early juncture.

For these reasons, this Court should deny FirstKey's Motion in its entirety.

### Relevant Facts

### A. Plaintiff was the subscriber to and customary user of cellular telephone number (317) 225-6386, which she obtained in July 2018.

Plaintiff was the subscriber to and sole customary user of cellular telephone number (317) 225-6386 from July 2018 through August 2019. *See* Plaintiff's Statement of Undisputed Material Facts ("SOF") No. 1; *see also* Declaration of

Brenda Drake, dated November 1, 2019 ("Drake Decl."), at ¶ 4. Plaintiff became the subscriber to her -6386 number in July 2018 after having lived in Indiana for a few months. SOF No. 2; Drake Decl., at ¶ 6.

Plaintiff did not personally select her -6386 telephone number. Rather, Cricket Wireless—her wireless service provider—assigned the number to Plaintiff when she asked to switch to an Indiana telephone number from her previous California number. SOF Nos. 2-3; Drake Decl., at ¶¶ 6-7.

### B. FirstKey called Plaintiff's cellular telephone number twice and, in both instances, Plaintiff's voicemail greeting identified her phone as belonging to Brenda.

Plaintiff received at least two calls to her -6386 number from FirstKey. SOF No. 4; Drake Decl., at ¶ 8; *see also* Declaration of Matthew B. Hansen ("Hansen Decl."), Doc. 29-3, at ¶ 16. FirstKey made the first such call on January 5, 2019. SOF No. 5; Drake Decl., at ¶ 9; Hansen Decl., at ¶ 17.

At the time of FirstKey's first call to her, Plaintiff's greeting that played when someone reached her voicemail stated: "Hi, you have reached Brenda's cell phone. Just leave me a message and your number and I'll get back to you as soon as I can. Thanks for calling, have a great day." SOF No. 6; Drake Decl., at ¶ 10.

Then, on February 14, 2019, FirstKey called Plaintiff again. SOF No. 7; Drake Decl., at ¶ 12; Hansen Decl., at ¶ 19. Plaintiff's voicemail greeting on February 14,

2019 was the same as it was on January 5, 2019, identifying the telephone as belonging to Brenda. SOF No. 8; Drake Decl., at ¶ 14.

**C. FirstKey left a prerecorded solicitation message on Plaintiff's cellular telephone voicemail.**

In connection with its February 14, 2019 call, FirstKey left a prerecorded voice message on Plaintiff's cellular telephone voicemail. SOF No. 9; Drake Decl., at ¶ 15. The prerecorded message stated:

> This is a courtesy call from FirstKey Homes. We're sprinkling a little love your way. We're presently offering $500 off of April rent on select homes. What an exciting offer. This promotion is on select homes through February 28th. Please call us today at 844-395-3959. We look forward to helping you select your new home. Thank you for choosing FirstKey Homes.

SOF No. 10; Drake Decl., at ¶ 16.

**D. Plaintiff had no relationship with FirstKey, did not provide her cellular telephone number to FirstKey, and did not consent to its calls.**

Prior to receiving calls from FirstKey, Plaintiff had never heard of FirstKey. SOF No. 12; Drake Decl., at ¶ 19. Moreover, Plaintiff never requested calls from FirstKey and never provided her cellular telephone number to FirstKey. SOF Nos. 12-13; Drake Decl., at ¶¶ 20-21.

And while FirstKey contends it obtained Plaintiff's number from Zillow, Plaintiff did not make any inquiries through Zillow. SOF No. 20; Drake Decl., at ¶ 34. Nor did Plaintiff provide her cellular telephone number through Zillow, or agree to Zillow's terms and conditions. SOF Nos. 21-22; Drake Decl., at ¶¶ 35-36.

6

To be sure, Plaintiff has never toured, visited, or inquired about a rental property located at 3446 N. Maura Court, Indianapolis, Indiana or one located at 1733 N. Mutz Drive, Indianapolis, Indiana. SOF Nos. 23-24; Drake Decl., at ¶¶ 37-38. In fact, Plaintiff never rented an apartment or home from anyone in Indiana other than her aunt, nor did she look to do so. SOF Nos. 25-26; Drake Decl., at ¶ 39.

At bottom, Plaintiff never spoke with FirstKey, never requested information from FirstKey, and did not provide FirstKey with express consent to call her cellular telephone number with an ATDS or with an artificial or prerecorded voice. SOF Nos. 27-29; Drake Decl., at ¶¶ 40-42.

### E.  Plaintiff does not know Brittany Valentine.

While FirstKey contends it was attempting to reach Brittany Valentine when it called the -6386 number, Plaintiff is not Brittany Valentine. SOF No. 15; Drake Decl., at ¶ 23. Plaintiff does not know Ms. Valentine, has never met or spoken with her, and has never pretended to be or held herself out as Brittany Valentine. SOF Nos. 16-18; Drake Decl., at ¶¶ 24-26.

### Legal Standard

As this Court explained in evaluating a motion for summary judgment under Rule 56:

> The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. . . . In determining

7

whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.

*J&J Sports Prods. Inc. v. Midtown Haven, Inc.*, No. 1:18-CV-03581-LMM, 2019 WL 4751865, at *2 (N.D. Ga. June 5, 2019) (May, J.).[1]

Then, "[o]nce the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute." *Id*. Germane here, "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999).

## Argument

### I.   Binding Eleventh Circuit law forecloses FirstKey's reliance-based defense.

#### A. The TCPA is a strict liability statute, and that FirstKey claims to have received misinformation from Ms. Valentine is immaterial for standing and liability purposes.

The TCPA prohibits making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227

---

[1]   Unless otherwise indicated, all internal citations and quotations are omitted and all emphasis is added.

(b)(1)(A)(iii). The TCPA creates a private right of action where a person may bring "an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater." *Id.* § 227(b)(3)(B). "Prior express consent" of the called party is an affirmative defense to a TCPA action. *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012) *aff'd*, 755 F.3d 1265 (11th Cir. 2014).

Pertinent here, "[t]he TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011); *see also Johnson v. Capital One Services, LLC*, No. 18-cv-62058-BLOOM/Valle, 2019 WL 4536998, at *6 (S.D. Fla. Sept. 19, 2019) ("First, contrary to Capital One's assertion, it is well settled in this Circuit that the TCPA is essentially a strict liability statute that does not require intent except when determining an award of treble damages.") (collecting cases).

So, while FirstKey describes its argument as one of standing (*i.e.*, that it did not cause harm to Plaintiff through its calls to her because Ms. Valentine—who FirstKey maintains provided it with inaccurate formation—is the real one to blame), *see* Motion at 10-12, in reality FirstKey takes issue with the strict liability nature of the TCPA. In other words, FirstKey suggests that this Court should not hold it liable for its unwanted calls to Plaintiff because FirstKey is not the one at fault—Ms.

9

Valentine is. But because the law is well-settled that robocallers like FirstKey are strictly liable for calls they make and prerecorded messages they deliver, FirstKey's defense fails.[2]

### B. Even if FirstKey obtained prior express consent from Ms. Valentine, Plaintiff is the called party and consent must come from her.

FirstKey separately argues that because it obtained express written consent from Ms. Valentine (it did not, *see infra* Argument, § I.D.), it could reasonably rely on that consent to call Plaintiff. Motion at 12-16. FirstKey's position, however, is at odds with Eleventh Circuit precedent.

---

[2]    While FirstKey styles its Motion as one for summary judgment under Rule 56 and not one for lack of Article III standing, it raises standing-based arguments that warrant a brief response. In *Palm Beach Golf Center–Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, the Eleventh Circuit found a plaintiff had standing who received a single junk fax because, during the minute that it took to receive and process the fax, his fax machine was unavailable for receiving legitimate messages. 781 F.3d 1245, 1252 (11th Cir. 2015). Then, in *Salcedo v. Hanna*, the Eleventh Circuit found a lack of standing for receipt of a single text message because the message wasted only a few seconds of time and did not cause any additional harm. 936 F.3d 1162, 1172-73 (11th Cir. 2019). In sharp contrast here, stopping unwanted telemarketing calls (as opposed to a text message) goes to the heart of Congress' intent in creating the TCPA. Moreover, FirstKey's unwanted calls and prerecorded message were "annoying, harassing, aggravating, and frustrating." Drake Decl., ¶ 30. FirstKey's calls and message also invaded Plaintiff's privacy and took up her time and energy. *Id*, at ¶¶ 31-32. Indeed, FirstKey's February 14, 2019 prerecorded message was over 30 seconds long and, during the time Plaintiff listened to the unwanted message, her time, concentration, and telephone were occupied. *Id.*, at ¶¶ 16-18. Plaintiff, therefore, has Article III standing to bring her claims. *See Salcedo*, 936 F.3d at 1173 ("These precedents strongly suggest that concrete harm from wasted time requires, at the very least, more than a few seconds," and implying that an intrusion of longer than five seconds can create concrete harm sufficient for standing).

In *Osorio v. State Farm Bank, F.S.B.*, the Eleventh Circuit explained that consent to call must come from the called party (*i.e.*, the current subscriber), and not someone else such as a former subscriber. 746 F.3d 1242, 1251-52 (11th Cir. 2014). Adopting the Seventh Circuit's reasoning in *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640 (7th Cir. 2012), the court in *Osorio* explained:

> Anyway, there can't be any long-term consent to call a given Cell Number, because no one—not Customer, not Bystander, not even the phone company—has a property right in a phone number. Consent to call a given number must come from its current subscriber. Enhanced Recovery implicitly acknowledges this by saying that the current subscriber can rescind any earlier consent to call Cell Number. But this really means that Customer's authority to give consent, and thus any consent previously given, lapses when Cell Number is reassigned.
>
> We find this logic persuasive. Although State Farm argues that Betancourt could consent to the debt-collection calls (she being the equivalent of the Customer in *Soppet*) it also concedes that Osorio could revoke Betancourt's consent (he being the equivalent of the Bystander in *Soppet*). In tune with Judge Easterbrook's analysis, *we believe this really means that Betancourt had no authority to consent in her own right to the debt-collection calls to No. 8626 because one can consent to a call only if one has the authority to do so, and only the subscriber (here, Osorio) can give such consent, either directly or through an authorized agent.*

746 F.3d at 1251-52.

Here, FirstKey offers no evidence that Plaintiff provided it with consent to call, and the uncontroverted evidence demonstrates that she did not do so. FirstKey also fails to establish that Ms. Valentine had the authority to provide consent on Plaintiff's behalf. Because FirstKey did not obtain consent from the called party

11

(Plaintiff) or someone authorized to provide consent on her behalf, FirstKey's reliance-based defense fails as a matter of law—no matter what actions Ms. Valentine is alleged to have taken.

### C. The D.C. Circuit did not establish a broad "reasonable reliance" defense, which would be at odds with *Osorio* and the strict liability nature of the TCPA.

FirstKey separately suggests that the FCC's one-call "safe harbor" for calls to reassigned telephone numbers, while stricken down in *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018), now provides callers with a "reasonable reliance" defense for calls made to wrong numbers. Motion at 12-16. Such a defense is not only found nowhere in the text of the TCPA, but would be at odds with Eleventh Circuit precedent. *See supra* Argument, § I.B. Not surprisingly, then, FirstKey cites no decisions from courts in this Circuit that support its position, nor does it explain how its proposed defense squares with *Osorio*.

As an initial matter, the "safe harbor" FirstKey relies on concerned calls to reassigned telephone numbers, *i.e.*, numbers that changed hands, unbeknownst to the caller, after the caller obtained the number from the then-subscriber. Here, FirstKey offers no evidence—such as telephone records or a statement from Ms. Valentine—to establish that Ms. Valentine was the subscriber or customary user of telephone number (317) 225-6386 before it was reassigned to Plaintiff. For that

12

reason, the FCC's since-overturned "safe harbor" for calls to reassigned numbers and ensuing D.C. Circuit commentary offer no refuge to FirstKey here.[3]

In any event, multiple district courts have rejected FirstKey's position. For example, in *Jiminez v. Credit One Bank, N.A.*, the court found such a defense to be "inconsistent with the plain language of the statute":

> Credit One's argument finds no basis in the text of the TCPA, which only makes a caller's intent relevant in connection with the trebling of damages. . . . Nor is the FCC's "reasonable reliance approach" in the customary user context sufficiently analogous to the reassigned number context to support the kind of expansive exception to liability Credit One advocates for here. The customary user whose consent provides a basis for reliance under the FCC's 2015 Order interpretation is by definition someone who is a current, ongoing user of the relevant cell phone number. The reassignment of a number creates no relationship between the prior, consenting holder and the new holder. Thus, there is no reasonable basis for reliance on the original holder's consent as indicative of consent by the new user. Indeed, in a portion of the 2015 Order that the *ACA International* court later rejected, the FCC observed that there was "no basis in the statute or the record before us to conclude that callers can reasonably rely on prior express consent beyond one call to reassigned numbers" (2015 Order ¶ 90 n.312), and framed a very limited "reasonable reliance approach" by providing only a one-call safe harbor for reassigned numbers. Accordingly, the Court declines Defendants' invitation to recognize a reasonable reliance exception or defense that is inconsistent with the plain language of the statute.

---

[3]    To be clear, Plaintiff suspects that Ms. Valentine may have been a former subscriber to telephone number (317) 225-6386 because she received calls from several different entities looking for Ms. Valentine. Drake Decl., ¶¶ 28-32. However, Plaintiff does not know Ms. Valentine and has never met or spoken with her. *Id*. at ¶¶ 24-25. Nor has Plaintiff seen (and FirstKey has not provided) records establishing that Ms. Valentine was a previous subscriber. As a result, whether Ms. Valentine was a previous subscriber to (317) 225-6386 remains speculative conjecture.

No. 17 CV 2844-LTS-JLC, 2019 WL 1409425, at *6-7 (S.D.N.Y. Mar. 28, 2019).

The Northern District of California recently explained:

Although defendant is correct that the decision in *ACA International* did not seem to contemplate leaving in place a "strict liability regime," nor did the court suggest that it was leaving in its place a "reasonable reliance" standard. Defendant extends too far.

Further, in the wake of *ACA International*, the FCC has adopted new rules to create a safe harbor from TCPA liability for inadvertent calls to reassigned and recycled numbers that apply only to those callers who use the FCC's new database of reassigned numbers to determine if a number has been reassigned. In so adopting, the FCC expressed a desire to create a narrow safe harbor from TCPA liability and explicitly declined to adopt a more expansive version. *Id.* at 13. Additionally, the FCC characterized the court's decision in *ACA International* as favorably describing the then-proposed safe harbor for callers that check the database as "consistent with the Commission's past practice of taking a reasonable reliance approach *when interpreting* the TCPA," *id.* at 14 (emphasis supplied), further undermining that "reasonable reliance" represents a "standard" for dealing with reassigned numbers following *ACA International*.

*Perez v. Rash Curtis & Assocs.*, No. 16-cv-03396-YGR, 2019 WL 1491694, at *7 (N.D. Cal. Apr. 4, 2019); *see also Berman v. Freedom Fin. Network, LLC*, --- F. Supp. 3d ----, 2019 WL 4194195 , at *11, *13 (N.D. Cal. Sept. 4, 2019) ("The circuit courts that have considered whether intent is relevant to TCPA liability have all concluded that good faith error or mistake does not preclude a defendant's liability but is material only to the question of treble damages for willful conduct. . . . Thus,

14

defendants' contention that it maintained a good faith belief that it had consent to call Berman is not dispositive on the TCPA claims.").[4]

The out-of-circuit decisions cited by FirstKey are inconsistent with Eleventh Circuit law. As the court explained in *Jiminez*: "The Court respectfully disagrees with the conclusions reached in *Danehy v. Time Warner Cable Enters.*, 2015 WL 5534094, at *6-7 (E.D.N.C. Aug. 6, 2015) and *Chyba v. First Financial Asset Mgmt.*, 2014 WL 1744136, at *12 (S.D. Cal. Apr. 30, 2014), each of which held that a defendant's good faith belief that it had consent to call the plaintiff operated as a complete defense to TCPA liability." *Jiminez*, 377 F. Supp. 3d at 335 n.9.[5]

These decisions are also inapposite because FirstKey is not relying on consent purportedly given directly to it. Rather, it relies on consent it says Ms. Valentine gave to a third party (Zillow), which then provided Ms. Valentine's incorrect information to it. Yet FirstKey offers no evidence from Zillow regarding the reliability of its records or whether and, if so, how, it verifies the information

---

[4]     *See also Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 882 n.3 (8th Cir. 2005) ("The [TCPA] . . . makes no exception for senders who mistakenly believe that recipients' permission or invitation existed. The issue of intent, or more accurately, the issues of knowledge and willfulness, however, clearly are material to the question of treble damages.").

[5]     Likewise, *Roark v. Credit One Bank, N.A.*, 2018 WL 5921652, at *3 (D. Minn. Nov. 13, 2018), which contains little analysis, is "similarly unpersuasive." *Berman*, 2019 WL 4194195, at *12 n.14.

provided by users of its platforms. Given the lack of evidence regarding the reliability of Zillow's records, FirstKey fails to establish that it was reasonable for it to rely on information provided by Zillow in the first place. In that respect, what FirstKey characterizes as good faith, Doc. 29-1 at 12, 15, is, instead, blind faith.

Moreover, and as noted above, FirstKey does not establish that the number at issue was ever Ms. Valentine's, and so the FCC's previous "safe harbor" could not apply. Accordingly, FirstKey's reliance-based defense cannot succeed.

### D. FirstKey's consent defense separately fails because the narrow consent language it relies on does not cover the prerecorded telemarketing message it left for Plaintiff.

Separately, the narrow consent language on Zillow's website that accompanies requests for tours and applications does not cover the unrelated telemarketing message FirstKey left for Plaintiff. To be sure, the consent language allows Zillow and third parties to "call or text you *about your inquiry*," Docs. 29-4, 29-6, not to deliver telemarking messages unrelated to specific inquiries.

Here, FirstKey's February 14, 2019 prerecorded message stated:

> This is a courtesy call from FirstKey Homes. We're sprinkling a little love your way. We're presently offering $500 off of April rent on select homes. What an exciting offer. This promotion is on select homes through February 28th. Please call us today at 844-395-3959. We look forward to helping you select your new home. Thank you for choosing FirstKey Homes.

SOF No. 10; Drake Decl., at ¶ 16.

This generic telemarketing message does not reference either of the specific inquires FirstKey alleges Ms. Valentine made. *See* Doc. 29-3, at ¶¶ 9, 15 (referencing two inquiries regarding specific properties in Indianapolis). Moreover, FirstKey delivered its February 14, 2019 telemarketing message nearly six weeks after it says Ms. Valentine made her inquiries. *Id*. (noting January 4 and 5, 2019 inquires). Because those who submit inquires through Zillow only consent to receiving calls and messages "*about your inquiry*," Docs. 29-4, 29-6—and do not generally consent to receive unrelated telemarketing messages—any consent FirstKey claims it received from Ms. Valentine (or any other consumer) is ineffective in the first place.

This is because the written agreement on which a telemarketer relies to place robocalls must "include a *clear and conspicuous disclosure* informing the person signing that: (A) [b]y executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory *telemarketing calls* using an automatic telephone dialing system or an artificial or prerecorded voice." *Sullivan v. All Web Leads, Inc.*, No. 17 C 1307, 2017 WL 2378079, at *6-*7 (N.D. Ill. June 1, 2017).

Indeed, the FCC has expressed disapproval of such bait-and-switch tactics and warned consumers about them.[6] And the FTC recently sued another company for

---

[6]     *See*    https://www.consumer.ftc.gov/blog/2019/04/lead-generation-bait-and-switch ("You've probably shared your contact information online . . . sometimes you

similar practices.[7] Simply put, FirstKey cannot rely on narrow consent language—which authorized calls about specific property inquiries—to engage in an unfettered telemarketing campaign. *Sullivan*, 2017 WL 237807, at *6-*7 (denying motion to dismiss and finding purported website consent language upon which telemarketer relied to place robocalls invalid and unenforceable since it failed to provide consumers with sufficient notice of the consequences of providing their phone numbers).[8]

For these reasons, FirstKey did not obtain proper consent from anyone to leave the prerecorded message it left for Plaintiff.

---

might be looking for one thing and wind up getting something else – like calls about stuff you never asked for or wanted.") (last visited Nov. 13, 2019).

[7]     *See*     https://www.ftc.gov/news-events/press-releases/2019/04/ftc-charges-telemarketing-operation-misleading-job-seekers-making (last visited Nov. 13, 2019).

[8]     Zillow's Terms of Use, Doc. 29-7, provides no help to FirstKey. This is because the terms and conditions do not require "[a] prospective renter using the Zillow platform" to "attest to the accuracy of the information he or she provides to Zillow." Doc. 29-2 at ¶ 10. Rather, the terms and conditions state that "[w]hen you register for an account, you may be required to provide us with some information about yourself, such as email address or other contact information. You agree that the information you provide is accurate and that you will keep it accurate and up-to-date at all times." Doc. 29-7 at 2. That is, only those who *register for an account* "agree"—not "attest"—that the information provided "is accurate." *Id*. Because FirstKey does not establish that Ms. Valentine created a Zillow account, it cannot rely on the terms and conditions.

### E. Even if *Osorio* did not control—it does—FirstKey fails to establish the predicate facts for its reliance-based defense through admissible evidence.

While FirstKey's reliance-based defenses fail as a matter of law, it must be noted that FirstKey fails to establish the necessary factual predicate through admissible evidence. That is, and as Plaintiff explains through her responses to FirstKey's statement of facts, while FirstKey claims Ms. Valentine provided a telephone number, and consent to call that telephone number, through her interactions with the Zillow website, FirstKey offers no evidence from Ms. Valentine or any witness who saw Ms. Valentine provide such information to Zillow. *See generally* Docs. 29-2, 29-3. Nor does FirstKey provide any evidence from Zillow as to how it obtained the telephone number at issue, whether its records are accurate and reliable, and how, if it all, it verifies the information users provide to it. *Id*. Instead, FirstKey offers a printout it created from information it says Zillow provided to it. Doc. 29-5. That FirstKey document, however, does not verify what transpired between Ms. Valentine and Zillow. As a result, FirstKey fails to meet its summary judgment burden.

What's more, FirstKey does not establish that Ms. Valentine had the authority to provide Plaintiff's cellular telephone number (she did not). Without this necessary evidence, FirstKey cannot establish the necessary factual predicate for its defense.

### F. FirstKey was on actual notice that it was calling Brenda's cellular telephone number, not Brittany Valentine's.

While FirstKey offers no evidence from Zillow regarding the reliability of its records or how—if at all—it verifies the information provided by users of its platforms, FirstKey had actual knowledge that it was not calling Brittany Valentine's cellular telephone before leaving either voice message.

Specifically, at the times FirstKey called her, Plaintiff's outgoing voicemail greeting identified the phone as belonging to "Brenda." SOF Nos. 6, 8; Drake Decl., at ¶¶ 10, 14. As a result, FirstKey was on actual notice that it was calling the wrong number before leaving either voice message and before placing the February 14, 2019 call to her. For this additional reason, FirstKey's reliance-based defense fails.[9]

## II. Plaintiff adequately states a claim resulting from FirstKey's failure to provide an automated opt-out mechanism.

FirstKey separately violated the TCPA by delivering prerecorded voice messages in connection with telemarketing calls that did not provide Plaintiff with

---

[9] While FirstKey faults Plaintiff for not returning its January 2019 call, *see* Doc. 29-1 at 16-17, it is not Plaintiff's responsibility to ensure that FirstKey is calling the correct person. *See Knapper v. Cox Communications, Inc.*, 329 F.R.D. 238, 243 n.1 (D. Ariz. 2019) ("The Court is unaware of, and Defendant has not pointed to, any requirement that a potential plaintiff call and inform the defendant that it has an incorrect phone number. Nor does Defendant articulate why that would affect liability, assuming Defendant had already called that person without its consent."). Regardless, Plaintiff's voicemail greeting identified her as "Brenda," thus putting FirstKey on notice that it was calling the wrong number.

an ability to automatically "opt-out" of receiving FirstKey's unlawful calls (the "Opt-out Claim"). Doc. 1, ¶¶ 90-92; 47 C.F.R. § 64.1200(b)(3).[10]

FirstKey argues that Plaintiff cannot maintain her Opt-out Claim because she lacks standing to do so. Motion at 18-23. But the plain language of the TCPA, its implementing regulations, and supporting case law all suggest otherwise.

To start, Congress vested the FCC with authority to issue regulations implementing the TCPA. 47 U.S.C. § 227, *et seq.* Under this authority, the FCC promulgated 47 C.F.R. § 64.1200(b)(3), which provides:

> All artificial or prerecorded voice telephone messages shall . . . [i]n every case where the artificial or prerecorded voice telephone message includes or introduces an advertisement or constitutes telemarketing and is delivered to a residential telephone line or any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii), provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section....When the artificial or prerecorded voice telephone message is left on an answering machine or a voice mail service, such message must also provide a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism and automatically record the called person's number to the seller's do-not-call list.

---

[10]   FirstKey's failure to provide an automated opt-out mechanism underscores the unreasonableness of its insistence that Plaintiff should have called FirstKey back to inform it that it was calling the wrong number. The TCPA places the burden on callers to obtain consent—not on call recipients to correct errant callers. The TCPA also mandates the use of automated opt-out mechanisms to make it easier for called parties to get calls to stop. FirstKey's contrary position turns the TCPA on its head.

21

47 C.F.R. § 64.1200(b)(3).

Here, FirstKey's prerecorded messages violated 47 C.F.R. § 64.1200(b)(3). Doc. 1, ¶¶ 90-92. In particular, the prerecorded message FirstKey left for Plaintiff did not contain the requisite opt-out mechanism for the called person to make a do-not-call request. SOF No. 10; Drake Decl., at ¶ 16. In further contravention of § 64.1200(b)(3), upon calling the "844" number disclosed in the message, the caller is not connected directly to an automated, interactive voice- and/or key press-activated opt-out mechanism that automatically records the called person's number to the seller's do-not-call list.[11] Doc. 1, ¶¶ 48-49.

There can be no factual dispute that FirstKey failed to provide an automated opt-out mechanism in compliance with 47 C.F.R. § 64.1200(b)(3) as FirstKey does not assert its prerecorded calls contained such a mechanism. And FirstKey also implicitly admits the toll-free number it leaves in voicemail messages does not contain an *automated* mechanism to opt out of calls. *See, e.g.*, Doc. 17 at 40 ("FirstKey . . . provided a toll-free number for Plaintiff and/or members of the

---

[11]   *Cf.* 47 C.F.R. § 64.1200(b)(3) ("When the artificial or prerecorded voice telephone message is left on an answering machine or a voice mail service, such message must also provide a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism and automatically record the called person's number to the seller's do-not-call list.").

proposed classes to contact where a *human being* would answer and the individual

could revoke consent"). In fact, FirstKey's only defense is that Plaintiff lacks

standing to bring her Opt-out Claim because there exists no private right of action

and Plaintiff has not suffered a cognizable harm. In making that argument, however,

FirstKey overlooks authority in this District to the contrary:

> [A] violation of the TCPA presents a risk of real harm to consumers as
> each unwanted call or text message can result in the nuisance and
> invasion of privacy contemplated by Congress….The specific violation
> here, Defendant's failure to include an opt-out mechanism with its text
> messages, resulted in the precise harm the TCPA provisions aimed to
> prevent, namely the nuisance and invasion of privacy that result from
> unwanted text messages. Courts have recognized that the receipt of
> unwanted phone calls, standing alone, constitutes a concrete injury
> under the TCPA.…Defendant's violation of the TCPA, in the context
> of the facts of this case, is not the type of bare procedural violation
> described in *Spokeo*. *Rather, the violation resulted in the precise harm
> Congress sought to address in enacting the TCPA, and Plaintiff's
> Amended Complaint adequately alleges that she suffered an injury in
> fact.* Because Plaintiff adequately alleges standing, Defendant's Motion
> to Dismiss is denied.

*Liotta v. Wolford Boutiques, LLC*, No. 1:16-CV-4634-WSD, 2017 WL 1178083, at

*2-3 (N.D. Ga. Mar. 30, 2017) (Duffey, Jr., J.).

The court in *Engle v. Unified Life Ins. Co., Inc.*, reached a similar result:

> This argument is not well-taken. Section 227(b)(3) expressly authorizes
> a plaintiff to bring "an action based on a violation of this subsection or
> the regulations prescribed under this subsection." 47 U.S.C. §
> 227(b)(3); *see also Greene v. Sprint Commc'ns Co.*, 340 F.3d 1047,
> 1051 (9th Cir. 2003) ("Section 227, for example, authorizes an action
> for violation of the section 'or the regulations prescribed under this
> subsection.' ") (citing 42 U.S.C. § 227(b)(3)); *Bais Yaakov of Spring*

23

> *Valley v. Alloy*, Inc., 936 F. Supp. 2d 272, 286 (S.D.N.Y. 2013) ("Under the TCPA, the FCC is charged with prescribing regulations to implement the TCPA's requirements, see 47 U.S.C. § 227(b)(2), and parties may sue for violations of the statute "or the regulations prescribed" thereunder, id. § 227(b)(3)."). . . . Thus, when read in conjunction, Plaintiffs may allege violations of an express provision of the TCPA and, alternatively, violations of the implementing regulations prescribed under the TCPA, in separate counts. See 47 U.S.C. § 227(b)(3); Fed. R. Civ. P. 8(d)(2).

No. 14CV1908MMAJLB, 2014 WL 12508347, at *5 (S.D. Cal. Oct. 27, 2014); *see also Nack v. Walburg*, No. 10–CV–478, 2011 WL 310249, at *4 (E.D. Mo. Jan. 28, 2011) ("[I]f an opt-out notice is required by the regulation, Plaintiff has a right to bring a cause of action under the TCPA, alleging that Defendant violated this regulation . . . .").

Simply put, courts routinely recognize that plaintiffs have standing to maintain claims for violations of the TCPA's implementing regulations such as in this case. And because FirstKey's prerecorded message failed to comply with 47 C.F.R. § 64.1200(b)(3), this Court should deny its Motion.

## III.  This Court should not strike Plaintiff's class allegations.

FirstKey also asks this Court to "dismiss" Plaintiff's class allegations, which appears to more aptly be a request to "strike" those allegations. Doc. 29-1 at Argument § V. Regardless, when viewed through the proper lens of a motion to

strike, FirstKey's argument fails, as it is both premature and incorrect on the merits.[12]

To be sure, a motion to strike class allegations should only be granted where "it will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove." *Romano v. Motorola, Inc.*, No. 07-CIV-60517, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007).[13] And, since FirstKey "moved to strike the class allegation prior to [Plaintiff] moving for certification . . . the burden is on [FirstKey] to show that the alleged class[es] cannot meet the requirements of Rule 23." *Lunsford v. Woodforest Nat. Bank*, 299 F.R.D. 695, 697 (N.D. Ga. 2013). FirstKey has not met its burden.

To support its argument that it would be *impossible* to certify the proposed classes, FirstKey does little more than identify decisions from other courts that have declined to certify other TCPA classes under different facts, each of which was resolved—unlike here—after the parties fully briefed class certification. And while

---

[12]     Rule 12(f) authorizes the Court to strike any allegations that are "redundant, immaterial, impertinent, or scandalous." FirstKey does not address this standard, and this Court should deny its Motion on this basis as well.

[13]     *See also, e.g.*, *Cullars Family Timber Farm, LLLP v. Weyerhaeuser Co.*, No. CV 116-188, 2017 WL 7689146, at *6 (S.D. Ga. Apr. 27, 2017) ("[I]t is not 'plain enough' from Plaintiffs' complaint that it will be impossible to certify the class alleged."); *Nelson v. Mead Johnson Nutrition Co.*, No. 09-CV-61625, 2010 WL 11457653, at *2 (S.D. Fla. Mar. 18, 2010) ("Although the Plaintiff in this case may . . . have a difficult time obtaining class certification in this case, the Court is unprepared to declare at this time that class certification is impossible.").

some courts have declined to do so, many other courts have properly certified TCPA class actions involving wrong or reassigned numbers just like Plaintiff's first proposed class here.[14]

In any event, Plaintiff's No-Consent Class is not necessarily limited to "wrong or reassigned numbers." Because the purported consent language from the Zillow website upon which FirstKey relied to deliver the prerecorded message at issue is insufficient as a matter of law to constitute prior express written consent, *see supra* Argument, § I.D., Plaintiff can readily certify a class of consumers who received prerecorded telemarketing messages in reliance on the invalid consent language. *See, e.g.*, *Karpilovsky v. All Web Leads, Inc.*, No. 17 C 1307, 2018 WL 3108884, at *8 (N.D. Ill. June 25, 2018) ("the key question in this case is whether the proposed class members consented by submitting their information on [the] website . . . that question may be resolved in one stroke.").

---

[14]     *See, e.g.*, *Knapper*, 329 F.R.D. 238 (certifying over objection a "wrong number" TCPA class); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-Goodman, 2018 WL 3145807 (S.D. Fla. June 26, 2018) (certifying over objection an unintended recipient TCPA class); *Lavigne v. First Community Bankshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 WL 2694457 (D.N.M. June 5, 2018) (certifying wrong number TCPA class over objection); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017) (same); *Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501 (S.D. Ind. 2016) (same); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (same); *accord Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 322 F.R.D. 458, 462 (N.D. Ill. 2017) (certifying over objection a fax-based TCPA class, noting that "Class certification is 'normal' under the TCPA.").

Thus, FirstKey's argument is little more than an acknowledgement that class certification is not always a certainty under the TCPA. But this falls far short of demonstrating that certification of the proposed classes is impossible.

Otherwise, FirstKey's contention that Plaintiff is subject to so many unique facts and defenses that certification of the proposed classes is impossible fails because it is premature. *See McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1374 (N.D. Ga. 2013) (Batten, J.) (denying motion to strike class allegations because it is "premature" to do so and "the Court should wait until a motion for class certification is filed."); *Argentine v. Bank of Am. Corp.*, No. 8:15-CV-957-T-26JSS, 2015 WL 12844395, at *1 (M.D. Fla. July 29, 2015) (same, collecting cases). Thus, to the extent that FirstKey claims that Plaintiff is so unique and anomalous as to warrant denial of class certification, it may make that argument at the appropriate juncture, when the parties have had an opportunity for full discovery. As it stands today, FirstKey's position is entirely conclusory and unsubstantiated.

Moreover, FirstKey ignores Plaintiff's second proposed class—the No Opt-Out Class. Doc. 1, at ¶ 61. Because Plaintiff's proposed No Opt-Out Class hinges on the common legal questions of whether FirstKey's prerecorded telemarking messages failed to provide appropriate opt-out mechanisms, it is tailormade for class certification and common questions predominate.

Accordingly, this Court should decline FirstKey's efforts to strike Plaintiff's

class allegations. *See Etzel v. Hooters of Am., LLC*, 223 F. Supp. 3d 1306 (N.D. Ga. 2016) (May, J.) (denying motion to strike TCPA class allegations).

## IV.    The TCPA is constitutional.

Separately, FirstKey embarks on a misguided attack on the constitutionality of the TCPA as a whole. However, FirstKey conspicuously omits that the Ninth and Fourth Circuits recently addressed much of this very argument, and this Court should follow their guidance in declining to find that the TCPA is entirely unconstitutional.

Most recently, the Ninth Circuit ruled, in two successive decisions, that the TCPA contains certain content-based speech regulations that would be subject to strict scrutiny, including an exemption to the TCPA for calls placed for the purpose of collecting government-backed debts. *See Gallion v. United States*, 772 F.App'x. 604 (9th Cir. 2019); *Duguid v. Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019). In applying strict scrutiny to the government-backed debt exception, the government presented two interests advanced by the exception: the protection of privacy and the "public fisc." *Id.* at 1155-56. However, the Ninth Circuit determined that the government-debt exception was insufficiently narrowly tailored to advance those interests, as the exception was both "underinclusive, in that it excepts automated calls placed pursuant to the debt-collection exception, which are—all else being equal—every bit as invasive of residential and personal privacy as any other automated call," and "overinclusive because the government—in its own words—

could have accomplished the same goal in a content-neutral manner by basing the exception 'on the called party's preexisting relationship with the federal government.'" *Id.* Further, the government-debt exception was not the least restrictive means of protecting the public fisc. *Id.* at 1156. Accordingly, the Ninth Circuit declared that the government-debt exception was unconstitutional and severed it from the TCPA, and reiterated its holding approximately one month later in *Gallion*. 772 F.App'x. 605-06; *see also Am. Ass'n of Political Consultants, Inc. v. Fed. Commc'ns Comm'n*. 923 F.3d 159 (4th Cir. 2019) (same).

However, FirstKey now implicitly contends that the Ninth and Fourth Circuits got it wrong, and that severing exemptions would be an inadequate remedy. But FirstKey's conclusion is an extraordinary remedy to a simple problem, and flies in the face of the TCPA's own language. Specifically, the government-debt exception (which has no relevance to FirstKey's telemarking calls) can be severed from the TCPA, based in large part on Congress' specifically articulated intent: "If any provision of this chapter [containing the TCPA] . . . is held invalid, the remainder . . . shall not be affected thereby." *Duguid*, 926 F.3d at 1156 (quoting 47 U.S.C. § 608). Given that the TCPA includes "unambiguous language endorsing severability," the intent of Congress is clear, which creates a presumption of severability. *Id.* And, equally significant, the TCPA has been "'fully operative' for more than two decades" while the government-debt exception was only the product

29

of a recent amendment in 2015, so returning the TCPA to its previously constitutional state did not disturb Congressional intent, nor the constitutional rights of the parties. *Id.* at 1157.[15]

FirstKey's rebuttal is—in sum—that there are other equally problematic exemptions within the TCPA that doom the statute in its entirety, such as allowing for urgent medical communications. To be sure, the TCPA provides that the FCC "is statutorily authorized to exempt . . . 'calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect.'" *ACA Int'l*, 885 F.3d at 710 (quoting 47 U.S.C. § 227 (b)(2)(C)). Rather audaciously, FirstKey contends that healthcare-related messages or notifications about school closures are "just as intrusive as messages about rental availability or private debt," and so the justification for those exemptions fails strict scrutiny. Doc. 29-1 at 26. However, as noted in *ACA Int'l*—a case FirstKey relies on heavily elsewhere—the FCC was petitioned to exempt certain non-telemarketing healthcare calls, and after analyzing

---

[15]   S*ee also Wijesinha v. Bluegreen Vacations Unlimited, Inc.*, No. 19-20073-CIV, 2019 WL 3409487, at *6 (S.D. Fla. Apr. 3, 2019) ("If the Court were to find the amended TCPA unconstitutional, the proper action would be to sever the offensive provisions."); *Sliwa v. Bright House Networks, LLC*, No. 216CV235FTM29MRM, 2018 WL 1531913, at *6 (M.D. Fla. Mar. 29, 2018) (same).

various types of calls related to healthcare (such as scheduling, prescription notifications, or post-discharge follow-up), granted the requested exemption, but specifically tailored it to critical healthcare treatment-related messages, which would meet the "emergency purposes" exception to the TCPA's consent requirement. *Id.* at 713-14. So when faced with the argument—like FirstKey's—that "telemarking, solicitation, or advertising content, or which include accounting, billing, debt-collection, or other financial content" are also emergency healthcare-related messages, the D.C. Circuit found it "implausible," and rejected the challenge. *Id.*

FirstKey does not address the *ACA Int'l* court's ruling on this matter, nor can it credibly do so because urgent healthcare-related messages are not the same as debt-collection or rental availability-related messages, and they surely are not equally important to consumers.[16]

### Conclusion

For these reasons, Plaintiff respectfully requests that this Court deny FirstKey's Motion in its entirety.

---

[16]    Similarly, FirstKey's argument that the TCPA is overinclusive does not address the facts presented here: FirstKey was not making follow-up calls to its own customer; it was calling a wrong number.

Dated: November 14, 2019       Respectfully submitted,

*/s/ Shireen Hormozdi*
Shireen Hormozdi
HORMOZDI LAW FIRM, LLC
1770 Indian Trial Lilburn Road
Suite 175
Norcross, GA 30093
Phone:  (678) 395-7795
Fax:  (866) 929-2434
shireen@norcrosslawfirm.com

Gary M. Klinger (*pro hac vice*)
KOZONIS & KLINGER, LTD.
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (312) 283-3814
gklinger@kozonislaw.com

Aaron D. Radbil (*pro hac vice*)
GREENWALD DAVIDSON RADBIL
PLLC
401 Congress Avenue, Suite 1540
Austin, TX 78701
Phone: (512) 803-1578
Fax: (561) 961-5684
aradbil@gdrlawfirm.com

*Counsel for Plaintiff*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1**

I certify that the foregoing document was prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Time New Roman and a point size of 14.

/s/ *Shireen Hormozdi*
Shireen Hormozdi

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which automatically sends e-mail notification of such filing to any attorneys of record.

I hereby certify that on this date I mailed by United States Postal Service the foregoing document to the following non-CM/ECF participants:  None.

This 14th day of November 2019.

 /s/  *Shireen Hormozdi*
Shireen Hormozdi